UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MARTIN ENERGY SERVICES, LLC,

                Plaintiff,

v.

M/V BRAVANTE IX, ITS ENGINES,
MACHINERY, TACKLE, APPURTENANCES,
APPAREL, ETC., and BOLDINI, LTD.,
and GRUPO BRAVANTE, *In personam,*

                Defendants.

Case No. 5:14-cv-00322-RH-GRJ

BOLDINI, LTD., and
GRUPO BRAVANTE,

                Counterclaimants,

v.

MARTIN ENERGY SERVICES, LLC, O.W.
BUNKER & TRADING do BRASIL, O.W.
BUNKER MIDDLE EAST DMCC, and
ING BANK N.V.,

                Defendants on Counterclaim
                and Crossclaim.

**ING BANK N.V.'S POST-TRIAL BRIEF**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

ARGUMENT ............................................................................................................................... 8

I.      Martin Energy Has Not Demonstrated a Valid Claim to the Interpleaded Funds ............. 8

II.     ING is Entitled to the Interpleaded Funds ...................................................................... 20

CONCLUSION .......................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*,
    No. 6:14-cv-310-Orl-31TBS, 2015 U.S. Dist. LEXIS 127531 (M.D. Fl. 2015) ......... 11, 12

*A/S Dan-Bunkering v. M/V Zamet*,
    945 F. Supp. 1576 (S.D. Ga. 1996) ................................................................................. 19

*Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*,
    724 F.2d 1161 (5th Cir. 1984) ....................................................................................... 12

*Chem. Bank NY Tr. Co. v. Kheel*,
    369 F.2d 845 (2d Cir. 1966) ........................................................................................... 21

*Colonna's Shipyard, Inc. v. City of Key West*,
    No. 2:10-CV-63, 2011 U.S. Dist. LEXIS 72903 (E.D. Va. May 12, 2011) ................ 10, 11

*Container Applications Int'l, Inc. v. Lykes Bros. S. S. Co*,
    233 F.3d 1361 (11th Cir. 2000) ..................................................................................... 12

*Equilease Corp. v. M/V Sampson*,
    793 F.2d 598 (5th Cir. 1986) ......................................................................................... 18

*Exxon Corp v. Central Gulf Lines*,
    780 F. Supp. 191 (S.D.N.Y. 1991) ........................................................................... 16, 19

*Farwest Steel Corp. v. Barge Sea-Span 241*,
    828 F.2d 522 (9th Cir. 1987) ......................................................................................... 13

*Fiesta Charters v. U.S.*,
    No. 98-7182-CIV, 2000 U.S. Dist. LEXIS 21365 (S.D. Fla. Jan. 31, 2000)...................... 8

*Galehead, Inc. v. M/V Anglia*,
    183 F.3d 1242 (11th Cir. 1999) ................................................................................. 16, 19

*Hallowes v. Bedard*,
    877 So. 2d 953 (Fla. Dist. Ct. App. 2004) ..................................................................... 11

*Harding Realty, Inc. v. Turnberry Towers Corp.*,
    436 So. 2d 983 (Fla. Dist. Ct. App. 1983) ..................................................................... 11

*In re Auto Body Shop Antitrust Litig.*,
    No. 6:14-md-2557-Orl-31TBS, 2015
    U.S. Dist. LEXIS 114292 (M.D. Fla. June 3, 2015) ....................................................... 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Integral Control Sys. Corp. v. Consolidated Edison Co.*,
   990 F. Supp. 295 (S.D.N.Y. 1998) ..................................................................... 13

*J & P Trucking, Inc. v. USA Motor Express, Inc. (In re USA Motor Express, Inc.)*,
   No. CV-06-J-4875, 2007 U.S. Dist. LEXIS 79698 (N.D. Ala. Oct. 17, 2007) ............. 9, 10

*Karna v. BP Corp. North Am.*,
   11 F. Supp. 3d 809 (S.D. Tex. 2014) ................................................................ 10

*L&L Oil Co. v. M/V Rebel*,
   No. 96-30192, 1996 U.S. App. LEXIS 43467 (5th Cir. Aug. 28, 1996) ............................ 8

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*,
   199 F.3d 220 (5th Cir. 1999) ..................................................... 13, 16, 17, 18

*The Lottawanna*,
   88 U.S. 558 (1874) ............................................................................... 18, 19

*Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*,
   869 F.2d 473 (9th Cir. 1988) ....................................................................... 16

*One Beacon Ins. Co. v. Crowley Marine Servs.*,
   648 F.3d 258 (5th Cir. 2011) ......................................................................... 8

*O'Rourke Marine Servs. L.P. v. M/V Cosco Haifa et al.*,
   No. 15-cv-2992, 2016 U.S. Dist. LEXIS 48276, (S.D.N.Y. Apr. 8, 2016) ................*passim*

*Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*,
   254 U.S. 1, (1920)............................................................................... 12, 17

*Port of Portland v. M/V Paralla*,
   892 F.2d 825 (9th Cir. 1989) ....................................................................... 13

*Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc.*,
   565 F.3d 1293 (11th Cir. 2009) ..................................................................... 10

*Sullivan v. Nee*,
   No. 3:08-cv-486, 2009 U.S. Dist. LEXIS 61047 (N.D. Fla. July 17, 2009)..................... 11

*UPT Pool Ltd. v. Dynamic Oil Trading (Sing.) Pte. Ltd.*,
   No. 14-CV-9262, 2015 U.S. Dist. LEXIS 85950 (S.D.N.Y. July 1, 2015) ......................... 3

*Valero Mktg. & Supply Co. v. M/V Almi Sun*,
   No. 14-cv-2712, 2015 U.S. Dist. LEXIS 172258
   (E.D. La. Dec. 28, 2015).......................................................................*passim*

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Valero Mktg. & Supply Co. v. M/V Almi Sun*,
    No. 14-cv-2712, 2016 U.S. Dist. LEXIS 15086 (E.D. La. Feb. 8, 2016)............. 15, 16, 19

*Vestoil, Ltd. v. M/V M Pioneer*,
    148 F. App'x 898 (11th Cir. 2005) .................................................................................... 18

## Statutes

46 U.S.C. § 31342 ........................................................................................................................... 12

ING Bank N.V., as Security Agent ("ING"), respectfully submits this Post-Trial Brief in support of its claim to the funds interpleaded by Boldini, Ltd. and Grupo Bravante (together, "Boldini") and in opposition to all claims asserted by Martin Energy Services, LLC ("Martin Energy").

### PRELIMINARY STATEMENT

The facts at trial established that ING is entitled to recovery of the interpleaded funds in this case and that Martin Energy has no such right.  The evidence showed that Boldini, for the second time in 2014, ordered fuel from O.W. Bunker & Trading do Brasil ("O.W. Brazil"), a sales office or sourcing center for O.W. Bunker Middle East DMCC ("O.W. Middle East").  Boldini did not communicate with Martin Energy prior to this order being placed.  After the fuel was delivered, O.W. Middle East issued an invoice to Boldini, which it accepted without comment or objection.  The invoice, judicially admitted by Boldini, was payable to an ING account in the principal amount of $290,100.00.

Boldini did not pay the invoice.  Instead, three events intervened prior to the date that payment was due.  First, the parent company of the O.W. Bunker group (O.W. Bunker & Trading A/S) commenced insolvency proceedings on November 7, 2014.  Second, O.W. Bunker USA ("O.W. USA") commenced its own chapter 11 bankruptcy proceeding on November 13, 2014.  Third, on November 19, 2014, after its customer (O.W. USA) had gone bankrupt, Martin Energy (the physical supplier of the fuel) commenced this Rule B attachment proceeding seeking recovery directly against Boldini and its property located within the district, but not against the ship it had delivered fuel to, the BRAVANTE VIII, which had already left U.S. waters.

Those facts matter.  At the time of the collapse of the O.W. Bunker family of companies, the revolving credit agreement they had signed with their syndicate of lenders was drawn down by $647 million dollars.  Those lenders provided financing to O.W. Bunker entities,

1

against a borrowing base of the outstanding receivables issued by O.W. Bunker group companies.  That financing permitted the O.W. Bunker group to conduct its operations around the world.   ING (as Security Agent for the lender syndicate) is seeking the benefit of that bargain by requesting payment upon its valid rights to the receivables.  As shown at trial, O.W. Middle East, and ING by assignment, is owed a total of $298,803.00 upon the receivable owed by Boldini in principal, interest, and fees.

By contrast, Martin Energy's claim to the interpleaded funds was not established at trial and cannot be awarded by this Court on any legal or factual basis.  The evidence established that Martin Energy had an express contract with O.W. USA and no one else.  No evidence showed that Martin Energy expected to be paid by Boldini, or that Boldini expected to pay Martin Energy.  The evidence showed: (1) no order from the vessel or someone authorized by it to Martin Energy; (2) no communications between Martin Energy and Boldini; and (3) no direction by Boldini that Martin Energy supply the fuel to the BRAVANTE VIII.

The above facts are fatal to Martin Energy's claims under applicable case law: (a) its breach of contract claim fails because it did not and cannot show any contract with Boldini; (b) its *quantum meruit* claim fails because its express contract with O.W. USA governing the same subject matter bars any quasi-contractual claim and Boldini was in no way unjustly enriched; and (c) Martin Energy has not asserted and cannot establish a statutory maritime lien on this record.

Each of the parties here is a sophisticated entity.  Each was affected in different ways by the O.W. group's collapse.  ING and the lender syndicate extended credit to O.W. Bunker group entities, secured by their receivables, and seeks to prosecute their rights under their agreements and applicable law.  Martin Energy extended credit to O.W. USA on an unsecured basis, but is dissatisfied with the remedies available to it in the O.W. USA bankruptcy.  Like

2

other physical suppliers, Martin Energy found itself in a "sea of unsecured creditors" upon O.W. USA's collapse, and sought a "better solution" by asserting maritime and other claims against non-debtors. *See UPT Pool Ltd. v. Dynamic Oil Trading (Sing.) Pte. Ltd.*, No. 14-CV-9262, 2015 U.S. Dist. LEXIS 85950, at *32-33 (S.D.N.Y. July 1, 2015).  In essence, Martin Energy now seeks to obtain un-bargained for advantages over other creditors.  This the court should not permit.  ING respectfully requests that Martin Energy's claims be dismissed, and that judgment be entered for ING in the amount of $298,803.00.

## STATEMENT OF FACTS

### The O.W. Bunker Group's Business

Prior to entering insolvency, the O.W. Bunker Group – consisting of O.W. Bunker & Trading A/S ("O.W. Bunker & Trading") and certain of its subsidiaries – was divided into two primary business divisions: (1) a "physical supply" division, whereby an O.W. Bunker entity would own or charter barges to physically deliver fuel to vessels; and (2) a "reselling" or "trading" division, whereby an O.W. Bunker entity would purchase fuel from a third-party physical supplier and resell that fuel to a vessel owner or charterer.  *See* Trial Tr. at 88:13-21; 89:1-5 (Mortensen).  "Reselling" transactions (such as those underlying the fuel delivery in this case) were typically booked by the relevant O.W. Bunker entity as both a "receivable" and "payable," and there was "no contractual setoff" between those gross amounts.  *Id*. at 191:1-192:1 (Copley).  As a result, the O.W. Bunker entity was "on risk for both transactions" – meaning that even if the customer did not pay, the O.W. Bunker entity was still liable on its separate contract with the physical supplier, and if the O.W. Bunker entity did not perform, it was still liable for breach of contract.  *Id*.  In fact, the evidence showed that prior to bankruptcy, O.W. Bunker always paid its physical suppliers, but that there were instances when its customers

failed to make good on their corresponding contractual obligation to pay.  *See id.* at 154:10-155:23 (Mortensen).

**The Delivery of Fuel to the BRAVANTE VIII**

The fuel delivery at issue here involved three discrete transactions, all of which were "on risk."  Those transactions were between: (1) Boldini and O.W. Middle East; (2) O.W. Middle East and O.W. USA; and (3) O.W. USA and Martin Energy.  As noted by Mr. Copley:

> O.W. Bunker USA would buy the fuel from Martin, mark it up, sell it to O.W. Bunker Middle East, in this case.  O.W. Bunker would mark it up again, sell it to its customer, which is Boldini in this case.  I haven't looked up the individual accounting records, that's how it would be accounted in the normal course…

Tr. 192:5-22.

The record indeed reflects three separate bilateral transactions for 300 Metric Tons of gasoil:

| Invoice No. | Buyer | Seller | Amount | Price per Metric Ton | Source |
|---|---|---|---|---|---|
| 165-S11237 | Boldini | O.W. Middle East | $290,100.00 | $967 | ING Ex. 31 at ING FLA 0013 |
| 205-10177 | O.W. Middle East | O.W. USA | $287,512.08 | $957.90 (plus taxes / fees) | ING Ex. 31 at ING FLA 0001 |
| 10162256 | O.W. USA | Martin Energy | $286,342.08 | $954 (plus taxes / fees) | ING Ex. 31 at ING FLA 0010 |

In the first transaction, Boldini negotiated the terms with O.W. Brazil, which acted as a "sourcing center" or "sales office" for the seller, O.W. Middle East.  ING Ex. 31 at ING FLA 0057-58; Trial Tr. at 99:18-25, 179:2-10 (Mortensen).  The invoice sent to Boldini directed payment to O.W. Middle East, as evidenced by both the account details at the bottom of the invoice and the inclusion of O.W. Middle East's internal company code – 165 – in the "Invoice" and "Order" numbers.  *See* ING Ex. 31 at ING FLA 0013; Trial Tr. at 99:18-25 (Mortensen); *id.* at 100:1-3 (Mortensen) (confirming that invoice was attributable to O.W.

4

Middle East); *id*. at 102:2-10 (Mortensen) (describing internal company codes); Doc. 10 (Order) at E (the invoice delivered to Boldini was "issued by crossclaim defendant O.W. Bunker Middle East DMCC"). The principal invoice amount was for $290,100.00. ING Ex. 31 at ING FLA 0013.

Next, O.W. Middle East subcontracted with O.W. USA. *See* ING Ex. 31 at ING FLA 0006-09 (sales order confirmation). The invoice issued by O.W. USA to O.W. Middle East directed payment in the amount of $287,512.08, and listed O.W. USA's own internal company code – 205 – in the "Invoice" and "Order" numbers. *Id*. at ING FLA 0001.

Finally, O.W. USA subcontracted with Martin Energy for the physical delivery of the fuel. *See Id*. at ING FLA 004-05 (purchase order confirmation). Following delivery, Martin Energy invoiced O.W. USA in the amount of $286,342.08. *Id*. at ING FLA 0010.

This contractual chain is displayed graphically as follows:[1]



---

[1] Although Martin Energy submitted a demonstrative after trial purporting to "lay[] out who all the parties are and the relationship between each other," *see* Trial Tr. at 198:25-199:5 (Mahley), ING disputes that Martin Energy's demonstrative accurately reflects the relationships between the parties.

These three separate transactions would have been booked in the ordinary course as both "receivables" and "payables," with "no contractual setoff" between them. Trial Tr. at 191:1-192:1 (Copley). "O.W. Bunker Middle East would have a receivable for [Boldini]" and "a payable to O.W. Bunker USA," while "O.W. Bunker USA would have [a] receivable from Middle East and [a] payable to Martin Energy." *Id.* The differing invoice amounts reflected separate transactions between distinct entities, demonstrating the "vigorous intragroup trading" among traders in the O.W. Bunker Group seeking the best possible margins. *Id.* at 192:23-193:10 (Copley).

**ING's Role**

On December 19, 2013, ING and O.W. Bunker & Trading entered into a $700 million revolving credit agreement (the "Credit Agreement"), funded by a syndicate of lenders including ING, which served as "the main working capital facility for the O.W. Bunker Group globally." *See* ING Ex. 2; Trial Tr. at 163:25-164:10 (Copley). The amount that O.W. Bunker & Trading or its subsidiaries could draw down under the Credit Agreement depended on the "borrowing base," which comprised the amount of the actual receivables held by the O.W. Bunker Group at a given time. *Id.* at 164:20-165:13 (Copley). At its insolvency, O.W. Bunker & Trading had drawn down approximately $647 million on this facility. *Id.* at 165:14-17 (Copley).

Also on December 19, 2013, ING and O.W. Bunker & Trading entered into a security agreement (the "Security Agreement"), which set out the collateral assigned to ING as Security Agent on behalf of the syndicate of lenders financing the Credit Agreement. *See* ING Ex. 1; Trial Tr. at 166:20-167:7 (Copley). Under the Security Agreement, each "Receivables Chargor" listed on Schedule 1 assigned to ING *all* "rights, title and interest in respect of the

Supply Receivables," which meant "any amount owing, or to be owed, to a Receivables Chargor . . . under any Supply Contract" relating to the sale of oil products traded by the Group, and including any invoice issued thereunder.  ING Ex. 1 at ING 00005; Doc. 96 (Pretrial Stipulation) at F.11.  As Mr. Copley explained at trial, the effect of Section 2.3(a) was to assign ING "the complete package of rights" associated with the Supply Receivables.  Trial Tr. at 168:18-169:3.  Following the collapse of O.W. Bunker in November 2014, ING appointed a team of Joint Receivers (including Mr. Copley) to collect on those assigned receivables.  *See* ING Ex. 5.

It is undisputed that: (1) O.W. Middle East is a Receivables Chargor under the Security Agreement; (2) O.W. Middle East has, pursuant to that agreement, assigned to ING all of its rights in respect of receivables due from its customers; and (3) the invoice issued by O.W. Middle East to Boldini has not been paid.[2]  *See* Doc. 96 (Pretrial Stipulation) at F.12-14; Doc. 10 (Order) at E.

Under these facts, and as demonstrated below, ING – and *not* Martin Energy – is entitled to the full amount of the interpleaded funds on deposit, including the principal amount of O.W. Middle East's invoice to Boldini, interest through the date of payment into Court, and late charges accrued due to Boldini's late payment.  *See* ING Ex. 31 at ING FLA 0013 (invoice to Boldini stating that "[i]n case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions"); ING Ex. 28 (Terms and Conditions) at Clause I.5.[3]

---

[2] Moreover, ING and O.W. Middle East have entered into a cooperation agreement with respect to any receivables due to O.W. Middle East.  *See* Trial Tr. at 170:10-172:2 (Copley).  If ING collects on O.W. Middle East's invoice to Boldini, it will maintain that cash until ING and O.W. Middle East have agreed (or a court decides) whether the receivables have been validly assigned to ING.  *Id.*  If such assignment is agreed or deemed to be valid, ING will distribute the cash to the lender syndicate.  *Id.*  However, if O.W. Middle East were to successfully assert a security challenge, the cash would be distributed to creditors of O.W. Middle East in accordance with local insolvency laws.  *Id.*

[3] Boldini was aware of those terms and conditions – and expressly agreed to their application – at the time it was negotiating this transaction with O.W. Brazil.  Boldini informed O.W. Brazil that the delivery to the BRAVANTE VIII "will be paid for by Boldini as per the previous operation."  ING Ex. 31 at ING FLA 0057-58.  At trial, Claus Mortensen testified that he had identified the "one previous occasion" on which O.W. Middle East, Brazil Division had sold fuel to Boldini, in February 2014.  *See* Trial Tr. at 86:20-87:12; 102:17-22; *see also* ING Exs. 43 (sales

7

**ARGUMENT**

**I.      Martin Energy Has Not Demonstrated a Valid Claim to the Interpleaded Funds**

**A.      Martin Energy's Breach of Contract Claim Must Fail**

Martin Energy's breach of contract claim against Boldini is groundless.  Not a single witness at trial testified to any facts that would establish the basic elements – offer, acceptance, and consideration – of a valid contract between Martin Energy and Boldini.[4]  *See Fiesta Charters v. U.S.*, No. 98-7182-CIV, 2000 U.S. Dist. LEXIS 21365, at *4 (S.D. Fla. Jan. 31, 2000); *see also* Doc. 102 (Tr. of S. J. Hearing) at 35:22-24.

Instead, it is plain that Martin Energy's only contract was with O.W. USA.  *See* ING Ex. 31 at ING FLA 0004-05 (purchase order confirmation sent by O.W. USA to Martin Energy); *id*. at ING FLA 0010 (invoice sent by Martin Energy to O.W. USA).  Martin Energy's own witness, John McClelland, agreed that Martin Energy had "received an order from O.W. Bunker" and that "O.W. Bunker USA was [Martin Energy's] customer."  Trial Tr. at 62:15-16, 44:1-3.  At the time of the fuel delivery, Martin Energy likewise identified "OW Bunker USA" as the "Customer" on the bunker delivery receipt.  *See* MES Ex. 8 at MES 00005; Trial Tr. at 35:12-17 (Nobles) (top half of bunker delivery receipt was filled out by Martin Energy).  Martin Energy invoiced only O.W. USA once the fuel delivery was complete.  ING Ex. 31 at ING FLA

---

order confirmation) and 44 (invoice).  The sales order confirmation issued to Boldini for that transaction states that "[t]he sales and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers," notes that those terms are "well known to [Boldini] and remain in [Boldini's] possession," and also includes a website reference to those terms.  ING Ex. 43 at p. 2; *see also One Beacon Ins. Co. v. Crowley Marine Servs.*, 648 F.3d 258, 268 (5th Cir. 2011) (terms on website incorporated by reference in repair service order).  Boldini paid O.W. Middle East for that delivery on March 31, 2014.  Trial Tr. at 106:11-107:2 (Mortensen); ING Ex. 45 (bank voucher).

[4] Nor can Martin Energy argue that the bunker delivery receipt constituted a contract between itself and Boldini.  As Mr. McClelland acknowledged at trial, a bunker delivery receipt is required by law for every delivery of bunkers to an offshore vessel.  Trial Tr. at 60:18-21; *see also L&L Oil Co. v. M/V Rebel*, No. 96-30192, 1996 U.S. App. LEXIS 43467, at *3 (5th Cir. Aug. 28, 1996).  Moreover, there is no evidence in the record that Martin Energy and Boldini ever discussed or negotiated any language on the bunker delivery receipt.  *See id*. at 35:23-25 (Nobles) (admitting that he did not "negotiate anything about the language [on the receipt] with the captain or the representative of the BRAVANTE VIII").

0010; Trial Tr. at 68:21-23 (McClelland) (admitting that Martin Energy did not issue an invoice to Boldini).

Simply put, Martin Energy's only valid claim for breach of contract is against O.W. USA in bankruptcy court – and indeed, Martin Energy has filed proofs of claim in bankruptcy that seek to recover on that unpaid invoice. *Compare* ING Ex. 31 at ING FLA 0010 (invoice from Martin Energy to O.W. USA for $286,342.08) *with* ING Ex. 49 at 1 *and* ING Ex. 50 at 1 (amount of claim against O.W. USA increased by $286,342.08 in amended proof of claim).

In *J & P Trucking, Inc. v. USA Motor Express, Inc. (In re USA Motor Express, Inc.)*, the court rejected a similar attempt by a subcontractor to assert a contract claim further up the supply chain from its bankrupt counterparty. No. CV-06-J-4875, 2007 U.S. Dist. LEXIS 79698 (N.D. Ala. Oct. 17, 2007). There, the defendant, LG Electronics USA, Inc., had contracted with USA Motor Express, Inc. ("USA"), to haul goods; USA had in turn contracted with plaintiff-shipping companies to haul those loads. *Id*. at *5. Although LG paid USA on *its* contract, USA failed to pay plaintiffs. *Id*. USA filed for bankruptcy, and the shipping companies sought to pursue a claim directly against LG. *Id*. at *4. The court dismissed that claim, reasoning that "to allow plaintiffs to proceed directly against LG renders not one, but two contracts meaningless":

> The plaintiffs knew they contracted with USA to obtain loads to carry and in return, they were to be paid for hauling these loads by USA, regardless of from where the loads originated, and regardless of whether USA had been paid by the shipper for those loads. Similarly, LG's contract with USA clearly states the intention of the parties that LG would tender payment to USA directly for loads tendered to USA for shipment, regardless of whether USA actually hauled that load.

*Id*. at *17.  While it "sympathize[d] with the plaintiffs due to the lack of payment," the court

noted that "[a]ny right of action the plaintiffs have is properly against USA, whether in

bankruptcy proceedings or not.  The court cannot rewrite the parties' contracts because

unforeseeable later events caused the plaintiffs to suffer a loss."  *Id*. at *17-18.

Similarly, Martin Energy is "bound by the contract[] [it] willingly and knowingly

entered."  *Id.* at *17.  Martin Energy should not be rewarded for seeking to bypass the

bankruptcy process and assert its claims against an entirely different entity simply "[b]ecause [it]

would like to get paid."  *See* Trial Tr. at 53:15-19 (McClelland).

## B.      Martin Energy's *Quantum Meruit* Claim Must Fail

Martin Energy's express agreement with O.W. USA also bars its quasi-

contractual claim.  Federal courts considering *quantum meruit* claims arising in admiralty apply

state law subject to the doctrine of uniformity under admiralty law.  *See Sea Byte, Inc. v. Hudson

Marine Mgmt. Servs., Inc.*, 565 F.3d 1293, 1301 n.8 (11th Cir. 2009) ; *Colonna's Shipyard, Inc.

v. City of Key West*, No. 2:10-CV-63, 2011 U.S. Dist. LEXIS 72903, at *31-32 (E.D. Va. May

12, 2011) (applying Virginia law).  Because the fuel supply at issue in this case took place in

Florida, Florida law applies.  *Id*.[5]

It is well settled that "a plaintiff is not entitled to employ the legal fiction of quasi-

contract to substitute one promisor or debtor for another."  *See In re Auto Body Shop Antitrust

Litig.*, No. 6:14-md-2557-Orl-31TBS, 2015 U.S. Dist. LEXIS 114292, at *459 (M.D. Fla. June 3,

2015) (internal citations omitted).  But Martin Energy seeks to do just that, substituting Boldini

for O.W. USA.  Further, courts in Florida, as they do elsewhere, have refused to imply a contract

---

[5] Martin Energy's terms and conditions contain a Texas choice of law provision.  Although Martin Energy's claim is quasi-contractual and this provision should not apply, Texas law would also bar Martin Energy's *quantum meruit* claim.  *See Karna v. BP Corp. North Am.*, 11 F. Supp. 3d 809, 819 (S.D. Tex. 2014) (under Texas law, plaintiff cannot recover in *quantum meruit* when it seeks to recover "from a third party foreign to the original [contract] but who benefitted from its performance").

through *quantum meruit* where an express contract already exists regarding the same subject matter. *See Sullivan v. Nee*, No. 3:08-cv-486, 2009 U.S. Dist. LEXIS 61047, at *17 (N.D. Fla. July 17, 2009) (citing *Harding Realty, Inc. v. Turnberry Towers Corp.*, 436 So. 2d 983, 984-985 (Fla. Dist. Ct. App. 1983)).  Under this theory, Martin Energy's claim is barred.

   Martin Energy's *quantum meruit* claim also fails because there is no evidence that Martin Energy expected to be paid by Boldini, or that Boldini expected to pay Martin Energy, for the fuel delivery here.  Under Florida law, "[t]he basis for a *quantum meruit* award is essentially an equitable one.  One person should not benefit from the work efforts of another under circumstances where the person doing the work has the reasonable expectation of being paid *by the person benefitted*, and the person benefitted has a reasonable expectation of paying for the work."  *Hallowes v. Bedard*, 877 So. 2d 953, 957 (Fla. Dist. Ct. App. 2004) (emphasis added). In fact, the record shows that Martin Energy did not have a "reasonable expectation of being paid" by Boldini – Mr. McClelland admitted that he never issued an invoice to Boldini, or even spoke with Boldini about paying Martin Energy.  Trial Tr. at 68:21-69:1.  Nor did any testimony or evidence show that Boldini expected to pay Martin Energy rather than *its* contractual counterparty, O.W. Middle East, with whom it had dealt with – and paid – on a prior occasion. *See Colonna's Shipyard*, 2011 U.S. Dist. LEXIS 72903, at *1-4, 32-34 (shipyard could not assert *quantum meruit* claim against city where shipyard had not invoiced city, and city had no expectation of paying shipyard).

   Finally, Martin Energy's claim for *quantum meruit* fails because Boldini has already paid the fair value of the fuel into court and thus has not been unjustly enriched.  *See* Docs. 26, 106.  Under Florida law, a plaintiff seeking to assert a *quantum meruit* claim must demonstrate that "it would be inequitable for the defendant to retain the benefit *without paying fair value for it*."  *A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6:14-cv-310-

Orl-31TBS, 2015 U.S. Dist. LEXIS 127531, at *35-36 (M.D. Fl. 2015) (emphasis added).

Martin Energy's *quantum meruit* claim has no basis in law or fact, and must be dismissed.

    **C.**    **Martin Energy Has Not Asserted and Does Not Have a Maritime Lien**

        Martin Energy's Rule B attachment action does not afford this Court *in rem*

jurisdiction to award a lien in Martin Energy's favor.  A maritime lien is based on the *vessel*'s

obligation (and not the obligation of its owners), and therefore only applies to the specific vessel

to which necessaries were furnished.  *See Piedmont & Georges Creek Coal Co. v. Seaboard*

*Fisheries Co.*, 254 U.S. 1, 11 (1920); *see also Container Applications Int'l, Inc. v. Lykes Bros. S.*

*S. Co*, 233 F.3d 1361, 1365 (11th Cir. 2000).  Here, Martin Energy's action was brought as a Rule

B attachment of the BRAVANTE IX – a vessel to which it did *not* furnish necessaries – rather

than as a Rule C arrest of the BRAVANTE VIII, a vessel which is neither named here nor within

or contemplated to be within this district.  Accordingly, there is no *in rem* claim for a maritime

lien before this Court.  *See Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d

1161, 1164 (5th Cir. 1984) ("An action *in rem* . . . is available only to enforce a maritime lien or

when authorized by statute.  Rule C.  The arrest warrant extends only to the vessel 'or other

property that is the subject of the action.'"); *see also* Doc. 102 (Tr. of S.J. Hearing) at 15:8-13,

15:19-20, 35:14-20.

        Even if this was a maritime lien case, and it is not, Martin Energy would not be

entitled to a lien against the BRAVANTE VIII.  Under the Commercial Instruments and

Maritime Lien Act ("CIMLA"), 46 U.S.C. Ch. 313, a party claiming the right to a maritime lien

must show that it (1) furnished repairs, supplies, or other necessaries, (2) to any vessel, (3) *upon*

*the order of the owner of such vessel, or of the person authorized by the owner.*  46 U.S.C. §

31342 (emphasis added).  There is no dispute that bunker fuel deliveries are "necessaries" that

were furnished to a "vessel" within the meaning of the statute.  However, Martin Energy did not

furnish those bunkers "on the order of the owner or the person authorized by the owner" and therefore has not satisfied the statutory test.

The language of the statute ("authorized by the owner") is the language of agency, and the courts have noted that two lines of cases have developed – "middleman" and "general contractor/subcontractor" – to address when a maritime lien may be asserted by a physical supplier. *See Lake Charles Stevedores, Inc. v. M/V Professor Vladimir Popov*, 199 F.3d 220, 228-29 (5th Cir. 1999) (discussing caselaw).[6]  "These lines of cases are not inconsistent with each other, but instead provide different tests for adjudicating claims for maritime liens based on the nature of the relationship between the vessel owner and intermediary party that procured the bunkers from the physical supplier." *O'Rourke Marine Servs. L.P. v. M/V Cosco Haifa et al.*, No. 15-cv-2992, 2016 U.S. Dist. LEXIS 48276, at *10 (S.D.N.Y. Apr. 8, 2016).  Under the middleman line of cases, to have a lien, a physical supplier must demonstrate an agency relationship between the contracting entities and the vessel or vessel owner. *Id.* at *10-11.  If no such agency exists, then the general contractor/subcontractor analysis applies, and the physical supplier must demonstrate that "an entity with authority to bind the vessel *direct* that the general contractor hire a particular subcontractor." *See Lake Charles*, 199 F.3d at 231 (citing *Port of Portland v. M/V Paralla*, 892 F.2d 825, 826 (9th Cir. 1989), *Farwest Steel Corp. v. Barge Sea-Span 241*, 828 F.2d 522, 526 (9th Cir. 1987), and *Integral Control Sys. Corp. v. Consolidated Edison Co.*, 990 F. Supp. 295, 301 (S.D.N.Y. 1998)).  Martin Energy satisfies neither test.

After trial and before the filing of this brief, the U.S. District Court for the Southern District of New York, in a similar, related case, applied the above law and denied a physical supplier's maritime lien claim and held that ING possessed the maritime lien. *See*

---

[6] The terms used for these two lines of cases are not found in CIMLA and are a form of shorthand used by courts to assess the relationships between the parties.

*O'Rourke*, 2016 U.S. Dist. LEXIS 48276.  In *O'Rourke*, O.W. Far East (Singapore) Pte, Ltd.

("O.W. Far East") had contracted with an affiliate of the owners of two vessels for the supply of

fuel.  *Id*. at *2-5.  Similar to the facts here, in that case, O.W. Far East had in turn subcontracted

with O.W. USA, which subcontracted with O'Rourke Marine Services L.P., L.L.P. ("O'Rourke")

to deliver the bunkers.  *Id*.  Like O.W. Middle East, O.W. Far East is a Receivables Chargor

under the Security Agreement.  *Id*. at *6; *see also* ING Ex. 1 at ING 00028.

   The *O'Rourke* court not only rejected the physical supplier's claim for a maritime

lien, but found that "only ING possesses a maritime lien for the value of the fuel bunkers

supplied by O'Rourke."  *O'Rourke*, 2016 U.S. Dist. LEXIS 48276, at *14.  Noting that

"[m]aritime liens are disfavored by the law," the court first determined that there was no agency

relationship between the vessel owners and O.W. Far East under the "middleman" line of cases;

rather, as here, "[e]ach step in this supply chain involved a separate contract of purchase and

sale," and "each step was carried out independent of [the vessel and its owners]."  *Id*. at *8, 11

(internal citation omitted).  Moreover, again as here, O.W. Far East had invoiced the vessel

owner for a greater amount than the physical supplier had invoiced O.W. USA, "further

demonstrating that O.W. Far East was acting as a contractor, not as an agent."  *Id*.  The court

likewise found no evidence that the vessel owner "had no involvement whatsoever" in the

selection of the physical supplier, but "simply contracted with O.W. Far East for the provision of

the bunkers, and O.W. Far East independently subcontracted through the remaining steps of the

supply chain."  *Id*. at *12.  The court concluded that O.W. Far East, as "the party contractually

obligated to supply fuel to a vessel," was the only entity entitled to a maritime lien – and that

ING, as O.W. Far East's assignee, held the lien.  *Id*. at *14.

   Shortly before the court ruled in *O'Rourke*, the U.S. District Court for the Eastern

District of Louisiana came to a similar conclusion in another O.W. Bunker-related matter.

*Valero Mktg. & Supply Co. v. M/V Almi Sun*, No. 14-cv-2712, 2015 U.S. Dist. LEXIS 172258

(E.D. La. Dec. 28, 2015) ("*Valero I*") (denying physical supplier's motion for summary

judgment); *Valero Mktg. & Supply Co. v. M/V Almi Sun*, No. 14-cv-2712, 2016 U.S. Dist. LEXIS

15086 (E.D. La. Feb. 8, 2016) ("*Valero II*") (granting vessel owner's cross motion for summary

judgment and dismissing physical supplier's claim with prejudice).  In *Valero*, O.W. Bunker

Malta Ltd. ("O.W. Malta") had contracted with an agent for the vessel owner to supply fuel.

*Valero I*, 2015 U.S. Dist. LEXIS 172258, at *15.  O.W. Malta engaged O.W. USA, which then

contracted with Valero Marketing and Supply Co. ("Valero") to deliver the fuel.  *Id*. at *2, 15.

The court rejected Valero's claim for a maritime lien, finding no evidence that either (1) O.W.

Malta had acted as an agent of the vessel, or (2) an entity with authority to bind the vessel had

directed the selection of the physical supplier.  *Valero II*, 2016 U.S. Dist. LEXIS 15086, at *23,

27, 34-35.[7]

> As in *O'Rourke* and *Valero*, there is no evidence in this record that would entitle

Martin Energy to a maritime lien against the BRAVANTE VIII.  Instead, at trial, the evidence

established that:

- O.W. USA was *not* an agent of the Vessel.  *See* Trial Tr. at 70:15-24 (McClelland).

- Martin Energy received the order for fuel bunkers from its customer, O.W. USA.  *See id*. at 44:1-3 (McClelland) ("We received an order from O.W. Bunker."); *id*. at 62:15-16 (McClelland) (agreeing that "O.W. Bunker USA was [Martin Energy's] customer").

- Martin Energy did not communicate with the Vessel's owners or agents prior to that fuel order being placed.  *See id*. at 64:7-15 (McClelland) (agreeing he "had no communications with Bravante at any time prior to the order").

- Once it received the order from O.W. USA, Martin Energy's communications with the Vessel or its port agent, Hirth Ship Agencies, Inc. ("Hirth"), were purely

---

[7] To be clear, neither the *Valero* nor the *O'Rourke* courts created new law.  Rather, as shown above, they collected, analyzed, and applied relevant circuit court authorities.  *See* pp. 12-15, *supra*.

logistical.  *See, e.g.*, *id*. at 15:4-12 (Stephen) (Martin Energy kept in contact with Hirth "so that the delivery can be made smooth").[8]

The great weight of authority confirms that such facts do not give rise to a maritime lien under CIMLA.  *See Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999) (contract supplier entitled to lien where "bunkers were supplied pursuant to an agreement . . . [t]hat agreement caused, or provided for, the delivery of the fuel to the vessel," and under those circumstances, lien was conferred on contract supplier "irrespective of how, or by whom, the delivery was carried out"); *Lake Charles*, 199 F.3d at 230 ("Under general contractor cases, the actual deliverer of necessaries often is *not* entitled to a lien.") (emphasis added); *Exxon Corp v. Central Gulf Lines*, 780 F. Supp. 191 (S.D.N.Y. 1991) (party contractually obligated to supply fuel was entitled to lien, even though it had caused another supplier to deliver the fuel).

Martin Energy made no attempt at trial to establish that either O.W. Middle East or O.W. USA was an agent of the BRAVANTE VIII, with actual or apparent authority to bind the Vessel.  "Agency is never to be presumed; it must be shown affirmatively, and the party who asserts the existence of an agency relationship has the burden of proving it."  *Valero I*, 2015 U.S. Dist. LEXIS 172258, at *34.  Martin Energy has not satisfied its burden of proving that agency existed at every step – or *any* step – of the contractual chain.  *See supra* at 4-6.  To the contrary, Mr. McClelland testified that entities such as O.W. USA were in fact "*[n]ot* agents," but rather either "brokers" or "purchasing entities."  Trial Tr. at 70:15-24 (emphasis added).[9]

---

[8] *See also id*. at 13:23-14:1 (Stephen) (no communications with Hirth prior to October 16, 2014); *id*. at 40:2-20 (McClelland) (Martin Energy "talk[ed] first to O.W. Bunker, then to the owner's agent, then to the vessel").  Such post-order communications are not effective to confer a maritime lien.  *See Valero II*, 2016 U.S. Dist. LEXIS 15086, at *23-24 (finding that "Fifth Circuit precedent holds that acceptance of services from a supplier of necessaries does not alone create a maritime lien"); *see also Lake Charles*, 199 F.3d at 231-32.

[9] Martin Energy is likely to argue that *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9ᵗʰ Cir. 1988), means that it is not required to show an agency relationship between it and a person authorized by the vessel owner to order necessaries in order to assert a lien claim.  But *Ken Lucky* turned on a key admission by the vessel owner that the physical supplier sold fuel directly to a person authorized to bind the vessel under CIMLA – the subcharterer.  *Id*. at 476-477.  Because a direct link was established, the court found no need for the physical

16

Nor has Martin Energy offered any evidence that an entity with authority to bind the BRAVANTE VIII directed the selection of Martin Energy as physical supplier.  Although Mr. McClelland attempted to draw inferences based on emails he had seen between O.W. Brazil and Boldini, he ultimately admitted that those e-mails showed only that Boldini eventually became "aware of who was going to be making the physical supply."[10]  *See* Trial Tr. at 53:24-55:7, 56:23-59:16.  This is fatal, as "the mere knowledge that a particular subcontractor would be used does not necessarily create a maritime lien."  *Lake Charles*, 199 F.3d at 231; *Valero I*, 2015 U.S. Dist. LEXIS 172258, at *35.  Moreover, the logistical communications to which Mr. McClelland referred took place *seven days* after O.W. USA first contacted Martin Energy about buying fuel for the Vessel, emphasizing that Boldini did *not* order fuel from, let alone direct the selection of, Martin Energy.  *Compare* ING Ex. 31 at ING FLA 0047-48 (October 20, 2014 e-mail from O.W. Brazil to Boldini providing name of tug and fuel barge) *with* ING Ex. 39 at MES 00039 (October 13, 2014 e-mail from O.W. USA to Martin Energy seeking quote).  Logistical communications with Boldini's port agent were likewise all subsequent to the order.  *See* Trial Tr. at 14:2-6 (Stephen).

To the extent Martin Energy asserts that a maritime lien arose at the time it delivered the fuel bunkers to the BRAVANTE VIII, that argument must also be rejected.  Merely "[a]llowing [Martin Energy] to provide fuel to the Vessel and signing a receipt for the bunkers would not create a maritime lien where such actions were at least implicitly required by the contract" between Boldini and O.W. Middle East, as they clearly were.  *See Valero I*, 2015 U.S. Dist. LEXIS 172258, at *38.  And the fact that Martin Energy coordinated with the Vessel and/or

---

supplier to prove agency down the contractual chain.  *Id*.  Accordingly, the Ninth Circuit in that case did not hold that physical suppliers need not ever establish agency as a general rule.  In *Ken Lucky*, the statute was satisfied and a lien established by way of the admission.  That is not the case here.

[10] Notably, a maritime lien is "*stricti juris* and will not be extended by construction, analogy or inference." *Piedmont*, 254 U.S. 1, 12 (1920).

its port agent to effect the delivery does not somehow "ratify" a maritime lien.  *See Lake Charles*, 199 F.3d at 231-32 (no maritime lien even though vessel's hatches were opened and closed for the stevedores, the mate or master of the ship signed the subcontractor's activity sheets, the stevedores were allowed on board and used the vessel's gear, and the vessel's crew supervised the loading operation).  Likewise, language on the bunker delivery receipt cannot grant Martin Energy a maritime lien on the BRAVANTE VIII, as "it is settled law in the United States that a maritime lien can arise only by operation of law, regardless of any agreement between the parties."  *Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900 (11th Cir. 2005); *see also O'Rourke*, 2016 U.S. Dist. LEXIS 48276, at *8 ("[M]aritime liens are not creatures of contract – they are creatures of law, and solely of law.").[11]  The courts in *O'Rourke* and *Valero* rejected this very argument, finding that "[t]he mere signature of a receipt alleging the existence of a lien cannot create such a lien if the statutory requirements for the lien are not met."  *Id*. at *13; *see also Valero I*, 2015 U.S. Dist. LEXIS 172258, at *39.  For the same reason, Martin Energy cannot argue that its terms and conditions – which Boldini never accepted or agreed to – gave rise to a maritime lien.  *See id*. (language stating that physical supplier relied on credit of the vessel cannot create a maritime lien).[12]

Ships in commerce require predictability from the law, and there is a strong federal policy favoring uniformity in maritime law.  *See The Lottawanna*, 88 U.S. 558, 575

---

[11] The language in the bunker delivery receipt appears to be boilerplate utilized to avoid claims that Martin Energy's liens had been intentionally waived.  *See Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 605-07, 610 (5th Cir. 1986).

[12] Martin Energy may argue that Boldini is somehow bound to its own terms and conditions by operation of Clause L.4 of the O.W. Bunker Group's Terms and Conditions, which states that those terms are subject to variation when a third party physically supplying the bunkers "*insists* that the Buyer is also bound by its own terms and conditions." *See* ING Ex. 28 at Clause L.4 (emphasis added).  But there is nothing in the record indicating that Martin Energy ever "insisted" that Boldini be bound by its terms, and even if they did apply, they plainly cannot give rise to a maritime lien.  *See O'Rourke*, 2016 U.S. Dist. LEXIS 48276, at *13 ("[M]aritime liens are not creatures of contract – they are creatures of law, and solely of law.").  Indeed, the *O'Rourke* court dismissed without comment an identical argument by the physical supplier in that case, and noted that contractual terms are not applicable due to the statutory nature of the lien.  *Id*.

(1874).  As the *Valero* court noted, "uniform application of CIMLA is important to assure that both suppliers and vessels will justifiably expect that a supplier that furnishes necessaries to a vessel in a United States port will be protected."  *Valero II*, 2016 U.S. 2016 U.S. Dist. LEXIS 15086, at *27 (internal citations omitted).  Federal courts have established and repeatedly applied a straightforward, relationship-based analysis to determine when a physical supplier such as Martin Energy is entitled to a maritime lien.  The *O'Rourke* and *Valero* courts have uniformly applied the maritime lien law set forth by the Second, Fifth, Ninth, and Eleventh Circuits in reaching conclusions in cases such as this one.  That same result should obtain here.

### D.  ING Is the Only Party That Could Possess a Maritime Lien

As the *O'Rourke* court found, if any party to this action is entitled to a maritime lien, it is ING, as assignee of "the complete package of rights" associated with the supply receivables of O.W. Middle East, including lien rights.  *See* Trial Tr. at 167:14-169:3 (Copley).  O.W. Middle East took the order for fuel from Boldini, and remained liable on that contract regardless of Martin Energy's performance.  "[T]he fact that [O.W. Middle East] did not itself deliver the fuel bunkers is immaterial."  *O'Rourke*, 2016 U.S. Dist. LEXIS 48276, at *14 (ING entitled to lien as assignee of entity that was "contractually obligated to supply fuel to a vessel . . . despite the fact that it caused another supplier to actually deliver the ordered fuel to the vessel"); *Galehead*, 183 F.3d at 1245 (same); *A/S Dan-Bunkering v. M/V Zamet*, 945 F. Supp. 1576, 1579 (S.D. Ga. 1996) ("Courts have upheld liens on behalf of fuel brokers that dealt directly with the vessel or charterer even though the brokers never held actual title to the bunkers, but contracted another entity to deliver them."); *Exxon Corp.*, 780 F. Supp. at 191 (party contractually obligated to supply the fuel was entitled to lien, despite having caused another supplier to deliver the fuel); *Valero I*, 2015 U.S. Dist. LEXIS 172258, at *34-35 (fact that contracting entity (like O.W. Middle East) remained liable on contract with vessel's agent

19

"weigh[ed] in favor" of finding that it, and not physical supplier, possessed lien).  In line with these authorities, it is plain that ING is the only party to this action that has met all three requirements under CIMLA for a lien.

## II.        ING is Entitled to the Interpleaded Funds

Unlike Martin Energy, ING has a valid and uncontroverted right to the interpleaded funds as assignee of the unpaid receivables of O.W. Middle East.  As discussed above, it is undisputed that (1) O.W. Middle East is a Receivables Chargor under the Security Agreement; (2) O.W. Middle East has, pursuant to that agreement, assigned to ING all of its rights in respect of receivables due from its customers; and (3) the invoice issued by O.W. Middle East to Boldini has not been paid.  *See* Doc. 96 (Pretrial Stipulation) at F.12-14; Doc. 10 (Order) at E; *see also* ING Ex. 54 (Castro Dep. Tr.) at 20:22-21:4 ("we received the invoice and then we didn't pay on time").  ING is accordingly entitled to recover as assignee of O.W. Middle East's contract with Boldini.

Significantly, payment to ING would not represent a "windfall" simply because O.W. Middle East would have expected to realize only a marginal profit once it had paid *its* contractual counterparty, O.W. USA.  Rather, ING is seeking to recover on the receivables that secured the credit extended by the lending syndicate to the O.W. Bunker Group prior to its collapse.  This credit facility was "the main working capital facility for the O.W. Bunker Group globally."  *See* Trial Tr. at 163:25-164:10 (Copley).  And, as Mr. Copley explained at trial, "ING Bank, on behalf of the syndicate, advanced . . . up to 90 percent of the receivables" booked by O.W. Bunker group entities, amounting to some $647 million.  *Id.* at 165:14-17, 176:12-177:3.

In exchange for that lending, O.W. Bunker entities assigned to ING *all* "rights, title and interest" in respect of certain supply receivables held by Receivables Chargors, including, as relevant here, invoices issued for the sale of oil products traded by the O.W. Bunker

20

group.  *See* ING Ex. 1 at ING 00005; Doc. 96 (Pretrial Stipulation) at F.11.  ING's right to collect on that validly-assigned and bargained-for collateral has since been triggered, and the Joint Receivers are engaged in a worldwide effort to "recover the lending that was made" and "repay the syndicate of bankers who provided finance to O.W. Bunker based on that collateral."  *See* Trial Tr. at 176:12-177:3 (Copley).

The credit facility was structured such that O.W. Bunker was only able to borrow from the lending syndicate an amount that was at all times dependent on its borrowing base, comprised of outstanding receivables, which in turn served as the security for the lending syndicate.  *See id.* at 163:25-164:10, 164:20-165:13, 176:12-22 (Copley).  There is no windfall here.  ING deserves the benefit of its bargain.

By contrast, Martin Energy, which extended credit to O.W. USA, seeks the inequitable finding that, even if ING is properly secured and may assert claims held by O.W. Middle East, it should nonetheless be denied the benefits of its security agreement because Martin Energy, an unsecured creditor with lesser rights in bankruptcy against O.W. USA, is dissatisfied with those rights.  But "equality among creditors who have lawfully bargained for different treatment is not equity but its opposite."  *Chem. Bank NY Tr. Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966).  Martin Energy chose to contract with and rely on the credit of O.W. USA, which had an established line of credit with Martin Energy.[13]  *See* ING Ex. 31 at ING FLA 0010 (invoice from Martin Energy to O.W. USA); Trial Tr. at 65:5-10 (McClelland).  Martin Energy did not insist on payment up front or to receive security from O.W. USA, but instead extended credit on 30-day terms.  *Id.* at 65:11-17; ING Ex. 31 at ING FLA 0010 (invoice).

---

[13] Martin Energy admitted at trial that it made no check of the creditworthiness of the Vessel.  Trial Tr. at 65:18-19 (McClelland).  Nor did Martin Energy check to see whether the Vessel was encumbered by a mortgage, or whether Boldini was in restructuring or financial distress.  *Id.* at 66:2-7.

The O.W. Bunker Group was a publicly traded company and was number two in the world in terms of bunker trading and selling.  *See* Trial Tr. at 114:3-5 (Mortensen).[14]  Martin Energy is also part of a substantial group of companies and it has its own credit department which assessed credit risk.  *See id*. at 67:4-9 (McClelland) (Martin Energy is part of Martin Resource Management Corp. and related to Martin Midstream, LP, a master limited partnership listed on the NASDAQ), 65:5-7 (McClelland) (O.W.USA had a credit line with Martin Energy for "quite some time").  Both companies must live with the agreements they made and the risks they took.  Martin Energy, as the *Valero* court observed, seeks "to jump the [bankruptcy] line.  They'll get 100 percent, where other people in the bankruptcy might not get 100 percent."  *See* Doc. 108 (Notice of Supp. Authorities), Ex. 3 (Tr. of *Valero* S.J. Oral Argument) at 18:3-13.  ING, as assignee of O.W. Middle East, is entitled to recover on its claims against the interpleaded funds.  Martin Energy, however, has demonstrated no such entitlement and should be limited to pursuing its claims against O.W. USA in bankruptcy.

---

[14] At trial, counsel for Martin Energy suggested that, if information about O.W. Bunker's financial distress "had been made public by September or mid October, companies like Martin would not have given quotes to O.W. Bunker for sales."  Trial Tr. at 146:16-147:6 (Mahley).  But as a publicly traded company, O.W. Bunker & Trading A/S *did* publicly disclose indications of financial distress prior to the date on which O.W. USA first reached out to Martin Energy for a quote.  *See* World Maritime News, *Oil Price Drop Hurting OW Bunker* (Oct. 8, 2014), *available at* http://worldmaritimenews.com/archives/139048/oil-price-drop-hurting-ow-bunker/ (O.W. reporting an unrealized accounting loss before taxes of approximately $22 million in Q3 2014 and lowering full year guidance); ING Ex. 39 at MES 00039 (October 13, 2014 request for quote).  Mr. Copley was engaged to serve as Receiver of the Security Assets some 48 hours prior to the O.W. Bunker group's collapse when it was apparent he would be needed.  *See* Trial Tr. at 160:12-18.

**CONCLUSION**

For the foregoing reasons, ING respectfully requests that the Court enter judgment in its favor in the amount of $298,803.00 and dismiss Martin Energy's claims without costs or attorneys' fees to any party, and for such other and further relief as the Court deems just and proper.

**BURKE, BLUE,**
**HUTCHISON, WALTERS & SMITH, P. A.**
Attorneys for ING Bank N.V., as Security
Agent

By: _s\ Douglas L. Smith, Esq._
　　　DOUGLAS L. SMITH, ESQ.
　　　Florida Bar No. 0816140
　　　221 McKenzie Avenue
　　　Post Office Box 70
　　　Panama City, Florida  32402
　　　(850) 769-1414
　　　Fax (850) 784-0857
　　　E-mail:  dsmith@burkeblue.com

Of Counsel:

Bruce G. Paulsen
Brian P. Maloney
Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1200

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on 4/14/2016.  Participants in the case who are registered CM/ECF users were served by the CM/ECF system.

I further certify any participants listed on the filing receipt as non-CM/ECF users have been mailed the foregoing by US Mail.

> **BURKE, BLUE,**
> **HUTCHISON, WALTERS & SMITH, P. A.**
> Attorneys for ING Bank N.V., as Security
> Agent
>
>
> By: s/ Douglas L. Smith, Esq.
>     DOUGLAS L. SMITH, ESQ.
>     Florida Bar No. 0816140
>     221 McKenzie Avenue
>     Post Office Box 70
>     Panama City, Florida  32402
>     (850) 769-1414
>     Fax (850) 784-0857
>     E-mail:  dsmith@burkeblue.com

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 7.1(F) of the Local Rules for the United States District Court for the Northern District of Florida.  The brief contains 7,955 words, exclusive of the Table of Contents, Table of Authorities, Signature Blocks, Certification of Service, and this Certification, as counted by Microsoft Word, the word processing system used to prepare it.

**BURKE, BLUE,**
**HUTCHISON, WALTERS & SMITH, P. A.**
Attorneys for ING Bank N.V., as Security Agent


By: _s/ Douglas L. Smith, Esq._____
    DOUGLAS L. SMITH, ESQ.
    Florida Bar No. 0816140
    221 McKenzie Avenue
    Post Office Box 70
    Panama City, Florida  32402
    (850) 769-1414
    Fax (850) 784-0857
    E-mail:  dsmith@burkeblue.com