# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

MARTIN ENERGY SERVICES, LLC,

       Plaintiff,

v.                                    CASE NO.  5:14cv322-RH/GRJ

M/V BRAVANTE IX, etc., et al.,

       Defendants.

_____/

## OPINION ON THE MERITS

In this interpleader action, two parties assert competing claims to a specific fund that would have been paid in the first instance to another party had that other party not initiated bankruptcy proceedings. As both claimants agree, the fund must properly be distributed outside the bankruptcy proceeding; there will be no share-and-share-alike with other creditors. After a bench trial, this order reaches the substantive result that all parties to the underlying transaction intended—the substantive outcome that would have occurred had there been no bankruptcy.

This result flows from the applicable law and the equitable principles that apply in interpleader actions. The only complicating factor is that a ship is

involved and cases can be cited on both sides of the question whether the party who should get the fund acquired a maritime lien. That party has a winning contract or quantum-meruit claim, whether or not it has a winning maritime-lien claim.

## I. Facts

Boldini Ltd. is a Brazilian company that, perhaps together with related companies Grupo Bravante and Boldini S.A., arranged to have a ship, the M/V Bravante VIII, built in Panama City, Florida. The record is unclear on the relative roles of Boldini Ltd., Grupo Bravante, and Boldini S.A., and their relative roles make no difference for purposes of this case. This order uses "Boldini" to refer to any or all.

To arrange to have fuel provided to the Bravante VIII, apparently for its maiden voyage, Boldini contacted O.W. Bunker & Trading do Brasil ("O.W. Brasil"). Together with two affiliated entities—O.W. Bunker Middle East DMCC ("O.W. Middle East") and O.W. Bunker USA Inc. ("O.W. USA")—O.W. Brasil arranged for Martin Energy Services, LLC ("Martin"), a company based in Mobile, Alabama, to provide the necessary fuel to the Bravante VIII.

The transaction was structured not as a sale of fuel by Martin to Boldini but as a sale by Martin to O.W. USA, a sale by O.W. USA to O.W. Middle East, and a sale by O.W. Middle East to Boldini. O.W. Brasil functioned only as a broker. Had

there been no intervening bankruptcy, Boldini would have paid O.W. Middle East, who would have paid O.W. USA (probably through bookkeeping entries rather than cash), who would have paid Martin. The invoices reflected this. Thus Martin invoiced only O.W. USA., and O.W. Middle East invoiced Boldini.

Even so, Boldini and Martin were not strangers. Martin closely coordinated its delivery of the fuel with Boldini's local agent in Panama City, the Hirth Agency ("Hirth"), and with the Bravante VIII's captain and engineer. The ship was at sea for a test when Martin's barge approached Panama City from Mobile, necessitating logistical changes. Martin coordinated those changes directly with Hirth and the ship's officers; neither O.W. USA nor O.W. Middle East was involved.

Martin delivered the fuel on credit; it was not paid at the time of delivery. In agreeing to this arrangement, Martin relied partly on O.W. USA's creditworthiness—Martin had dealt with O.W. USA on other occasions and had provided it a line of credit. But Martin relied more heavily on the maritime lien that Martin believed it would have against the ship.

Before transferring the fuel, Martin tendered a bunkering certificate it expected an appropriate official to sign. After the transfer, the ship's engineer, with the captain's approval, signed the certificate. The certificate functioned as a receipt and confirmed compliance with governing regulations. But the certificate also had

contractual features. The certificate said the sale was subject to Martin's

"STANDARD TERMS & CONDITIONS OF SALE," and the certificate added:

> No disclaimer stamp of any type or form will be accepted on this bunkering certificate, nor, should any such stamp be applied, will it alter, change or waive MARTIN ENERGY SERVICES LLC's Maritime Lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction.

Martin's Ex. 8.

Boldini did not disclaim a maritime lien at any stage of the transaction. Quite the contrary, Boldini knew—or would have known had it sought to find out—that under United States law, delivery of the fuel would create a lien. Likewise, no O.W. entity disclaimed a maritime lien. That a lien came into existence upon delivery of the fuel was beyond doubt; the only issue was who possessed the lien. For its part, Martin expected payment from O.W. USA, but Martin believed it had a lien entitling it to recover against the ship if payment was not made.

## II.  Proceedings

All of this was a straightforward commercial transaction that came off without a hitch. The fuel met standards; the fuel was successfully loaded; and the ship sailed away. The transaction came off without a hitch, that is, until, shortly after delivery of the fuel, the O.W. entities collapsed. At that point no payment had been made by anyone. The parent O.W. entity, O.W. Bunker & Trading A/S,

initiated bankruptcy proceedings in the Netherlands. O.W. Middle East initiated bankruptcy proceedings in Dubai. O.W. USA initiated bankruptcy proceedings in Connecticut.

ING Bank N.V. ("ING") was the lead participant in a syndicate that provided working capital for the O.W. entities prior to their collapse. The syndicate held a security interest in assets that included receivables of O.W. Middle East and O.W. USA. ING has authority to act for the syndicate and asserts, without objection from the O.W. entities or anyone involved in the bankruptcy proceedings, that ING is entitled to collect outside of the bankruptcy proceedings the receivables of O.W. Middle East and O.W. USA. This includes receivables arising from the sale of fuel for the Bravante VIII. In short, ING holds and may enforce in this proceeding any relevant right that otherwise would belong to any O.W. entity.

Martin and ING assert conflicting claims for payment for the fuel. A tortuous and now irrelevant procedural background began with Martin's filing of this action and attachment of a different ship—the Bravante IX—as a means of obtaining quasi-in-rem jurisdiction over Boldini. Boldini submitted to this court's in personam jurisdiction, filed a counterclaim for interpleader, deposited into the court's registry the disputed principal amount plus an allowance for interest, and was discharged. Martin and ING appeared in personam and asserted their

conflicting claims. As all parties agree, the court has jurisdiction over the entire controversy, which will properly be resolved in this action.

The action was tried to the court. This order sets out the court's findings of fact and conclusions of law.

### III.  The Equitable Outcome

The intended result of this transaction was this. Boldini would pay $290,100 and would receive 300 metric tons of fuel on board the Bravante VIII. Martin would provide the fuel, deliver it, and receive $286,200. The O.W. entities would pocket the difference: $3,900. ING would advance nothing and would be more secure—not less—in that its borrowers would be better off by $3,900 than its borrowers would have been had this transaction never occurred.

The parties' intended result can easily be achieved in this action. Boldini has paid into the court's registry the agreed amount, $290,100. Boldini has received the fuel on board the Bravante VIII and by now undoubtedly has consumed it. Martin delivered the fuel and can be paid the agreed amount, $286,200, from the court's registry. ING, acting to enforce the rights of the O.W. entities, can receive from the court's registry the same $3,900 the O.W. entities would have received. This will leave ING $3,900 better off than it would have been had its borrowers not entered this transaction in the first place. Interest can be added as appropriate.

As a matter of common sense and simple fairness, anyone seeking to do justice in this situation would distribute the fund in precisely this way, achieving the parties' intended result. Giving the entire $290,100 to ING would provide it a windfall—a payment far beyond anything it could have achieved from the underlying transaction. The bankruptcy proceedings ought not impair ING's security, but neither should ING reap a windfall from those proceedings.

ING says, though, that Martin has no claim against Boldini or the Bravante VIII or the fund, and so cannot recover in this action, no matter how inequitable that might be. This order addresses in turn whether Martin has a contractual claim, a maritime lien, or a quantum-meruit claim. As it turns out, here, as in most other things, the law makes sense. ING's contrary position does not.

## IV.  Contract

Boldini initially contacted O.W. Brasil to arrange to purchase fuel. This led to entry into a contract between Boldini and O.W. Middle East. The contract was with O.W. Middle East regardless of whether Boldini knew of O.W. Middle East's involvement. This is so because O.W. Brasil acted only as an agent for O.W. Middle East—an agent for a disclosed or undisclosed principal. The contract between Boldini and O.W. Middle East was entered into at arm's length; these were unrelated entities.

O.W. Middle East in turn contracted with O.W. USA. This was not an arm's length contract, but that does not matter. The involvement of these two O.W. entities instead of either alone does not affect the analysis in any way.

O.W. USA entered into a contract with Martin requiring Martin to deliver fuel aboard the Bravante VIII. This was again an arm's length contract. In entering into this contract, O.W. USA acted as principal, not as an agent for Boldini. Boldini was not a party to this contract.

This means that Martin had a contract with Boldini only if a contract was entered into between these companies at the time of delivery of the fuel. I find as a fact that Martin and Boldini did enter into a contract at that time. The terms were these: Martin would provide the previously agreed amount and type of fuel on board the Bravante VIII. Boldini would pay Martin's price if the intermediary who was primarily liable did not do so, but Martin's only recourse against Boldini would be against the ship.

These terms square precisely with the contemporaneous written documentation. The ship's engineer, acting within the course and scope of his authority for Boldini, signed a certificate acknowledging "the vessel's ultimate responsibility and liability for the debt incurred through this transaction." Martin's Ex. 8. The engineer could properly bind the ship and its owner. *See Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200 (5th Cir. 1979). ING's

assertion that Boldini had no contract with Martin and no liability for this debt cannot be squared with this certificate.

ING notes, though, that under Florida law, a contract arises only when there is an offer and acceptance—a meeting of the minds on the contract's essential terms. *See, e.g.*, *Perkins v. Simmons*, 15 So. 2d 289, 290, 153 Fla. 595, 599 (1943). When Martin showed up with fuel and tendered the certificate, that was an offer to deliver the fuel on the terms stated in the certificate. When Boldini, through its captain and engineer, accepted the fuel, Boldini accepted Martin's terms. When the engineer signed the certificate, he confirmed acceptance of the terms.

There was also the requisite "meeting of the minds." The test is of course objective, not subjective; what is required is an agreement on a set of external signals, not the same subjective understanding of those signals. *See, e.g.*, *Macky Bluffs Dev. Corp. v. Advance Const. Servs., Inc.*, No. 3:06cv397/MCR/EMT, 2008 WL 4525018, *8 n.19 (N.D. Fla. Sept. 26, 2008) ("[C]ourts look not to 'the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing.' " (quoting *Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So. 2d 133, 136 (Fla. 2d DCA 2003))). Here the external signals were set out in the bunkering certificate in terms that could bear only one meaning: the ship bore ultimate liability for the debt arising from Martin's delivery of the fuel. That the

amount of the debt was not specified did not matter; it was a set amount that could readily be determined by reference to Martin's prior contract with the intermediary, if necessary.

To be sure, Martin had a preexisting duty to deliver the fuel. And the question whether a contract can be entered into in this way is not free of doubt. As it turns out, this makes no difference, because, as set out below, Martin is entitled to payment from the interpleader fund on additional grounds.

## V.  Maritime Lien

The Eleventh Circuit traced the history and purpose of maritime liens in *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868–72 (11th Cir. 2010). The full discussion is not repeated here. But three points deserve emphasis.

First, a purpose of maritime liens is to enable ships to obtain repairs or supplies in distant ports without immediate payment. A lien accomplishes this by giving a supplier a security interest in the ship—a security interest that has priority over preexisting liens. So, for example, a supplier of fuel can obtain a lien with priority over a preexisting secured creditor.

Second, although maritime liens originated under the common law, in the United States liens are now entirely creatures of statute. A lien exists, if at all, under the Federal Maritime Lien Act, 46 U.S.C. §§ 31341–43.

Third, the proper rule of construction is this: "the literal language of the statute . . . control[s] the disposition of the cases interpreting it." *Crimson Yachts*, 603 F.3d at 872 (quoting H.R. REP. NO. 100-918, at 16 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6104, 6109); *see also Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244 (11th Cir. 1999) ("The test for determining who is entitled to a maritime lien must come from a plain reading of the statute itself . . . ."). Other rules of construction of course are useful in interpreting the statute—but there is no rule requiring the statute to be interpreted more narrowly than called for by the statutory language itself.

The statute provides:

> Except [with respect to a public vessel], a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1) has a maritime lien on the vessel;
>
> (2) may bring a civil action in rem to enforce the lien; and
>
> (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a).

Under the statute's plain terms, a person acquires a maritime lien if the person (1) provides necessaries (2) to a vessel (3) on the order of the owner or a person authorized by the owner. *See Galehead*, 183 F.3d at 1244.

Martin supplied necessaries—fuel—to a vessel, the Bravante VIII. By supplying the fuel, Martin "provided" it, at least when that term is given its ordinary meaning. *See, e.g.*, *Provide*, OXFORD ENGLISH DICTIONARY (9th ed. 1971) (listing definitions of "provide" including "[t]o supply or furnish for use"). On that view, Martin acquired a maritime lien on the vessel if it provided the fuel "on the order of the owner or a person authorized by the owner."

The statute does not limit the term "a person authorized by the owner," but the statute does list persons who are *presumed* to have the requisite authority:

> The following persons are presumed to have authority to procure necessaries for a vessel:
>
> (1) the owner;
>
> (2) the master;
>
> (3) a person entrusted with the management of the vessel at the port of supply; or
>
> (4) an officer or agent appointed by—
>
>> (A) the owner;
>>
>> (B) a charterer;
>>
>> (C) an owner pro hac vice; or
>>
>> (D) an agreed buyer in possession of the vessel.

*Id*. § 31341(a).

Here there are no facts that alter the statutory presumption one way or the other. The captain, the engineer, and Hirth, as Boldini's agent at the port, all had authority to procure necessaries for the Bravante VIII.

All of these—the captain, the engineer, and Hirth—dealt directly with Martin (through its agents) on the logistics for delivery of the fuel. Before delivery began, Martin provided the bunkering certificate that an official would be required to sign. The bunkering certificate made clear that Martin claimed a maritime lien. After delivery of the fuel, the engineer signed the certificate.

As a matter of ordinary English, it is difficult to assert that Martin did not deliver the fuel "on the order of" the captain and the engineer, if not also Hirth. Martin delivered the fuel when, where, and how the captain and engineer directed.

So a plain reading of the statute suggests that Martin acquired a maritime lien.

But there are complicating factors. Although Martin physically provided the fuel, O.W. Middle East and O.W. USA contracted to have the fuel provided. In that sense these entities also "provid[ed]" the fuel within the meaning of § 31342. And O.W. Middle East plainly acted on the order of the owner. ING says there can be only one maritime lien and only one provider in whose favor the lien runs. This is not self-evident; the statute includes no such explicit limitation, and in any event an owner could surely agree to grant a second lien even if one would not otherwise

exist. But the ship and its owner can properly be required to pay only once for any given product or service. A regime that allowed multiple maritime liens would have to recognize that any proper, full payment by the owner would discharge all liens.

So there is much to be said for the view that a single provision of necessaries produces only a single lien, at least absent an owner's agreement to grant a second lien. On that view, there is a reasonable argument that the holder of this lien, absent any agreement to grant a second lien, was O.W. Middle East, the party who contracted directly with Boldini. Had all gone as intended, it is O.W. Middle East to whom Boldini would properly have directed payment. ING embraces the single-lien theory and says the only party who obtained a lien against the Bravante VIII was O.W. Middle East.

The law of the circuit does not explicitly call into question the single-lien theory, but the law of the circuit *does* call into question the assertion that only O.W. Middle East acquired a lien against the Bravante VIII.

The most important Eleventh Circuit decision is *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999). There the court addressed three fuelings of a vessel. The vessel's charterer—equivalent to the owner for maritime-lien purposes—was Genesis. Genesis contacted Polygon, who in turn contacted Asamar for the first two fuelings. Asamar in turn engaged physical suppliers. For

the third fueling, Polygon directly contacted physical suppliers; Asamar was not involved. To that point the case mirrored ours: the owner or charterer contacted an intermediary who (with or without another intermediary) contacted a physical supplier.

What happened next was markedly different from the case at bar. An intermediary (Asamar for the first two fuelings, Polygon for the third) paid the physical suppliers. In each instance the intermediary who made the payment assigned its rights to Galehead, who sued to enforce the three maritime liens purportedly arising from the three fuelings.

The Eleventh Circuit upheld the claim for the third fueling but not for the first two. The difference was this: Polygon—the intermediary who paid the physical suppliers for the third fueling—dealt directly with, and thus acted "on the order of," the charterer, as required by § 31342. But Asamar acted only on Polygon's order. Asamar had no contact at all with the charterer, with any agent of the charterer, or with anyone aboard the vessel. So Asamar did not act "on the order of" anyone with authority to procure necessaries for the vessel.

*Galehead* does not determine the outcome of the case at bar because the facts are different. But the court's analysis cuts strongly in Martin's favor. The court did *not* say, as ING would have it, that the party who contracts with the owner to provide necessaries is always the party who acquires a maritime lien.

Instead, the court said that a downstream provider—referred to in the opinion as a "third-party provider"—sometimes does and sometimes does not acquire a lien, depending on whether "the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction." *Galehead*, 183 F.3d at 1245.

The court gave two examples of cases in which the third party—the party analogous to Martin—acquired a maritime lien, and two examples of cases in which the third party did *not* acquire a maritime lien.

First, in *Marine Coatings, Inc., of Alabama v. United States*, 932 F.2d 1370 (11th Cir. 1991), as summarized in *Galehead*, the owner was aware of the third party's role before and during performance; the third party performed 35 to 50% of the underlying contract; the owner inspected the third party's work; and the owner accepted the work. Martin has met and indeed exceeded this showing. Boldini, through its agent Hirth as well as through the captain and engineer, knew of Martin's role before and during performance; Martin performed 100% of the underlying contract; and Boldini, through the engineer, inspected and accepted the fuel. If, as the court held in *Marine Coatings* and reaffirmed in *Galehead*, the third party had a maritime lien on those facts, then Martin had a maritime lien here.

Similarly, in *Stevens Technical Services, Inc. v. United States*, 913 F.2d 1521 (11th Cir. 1990), again as summarized in *Galehead*, the owner was aware

beforehand of the third party's role; the underlying contract listed the third party as a party who would perform 15% of the work; and the owner knew the principal contractor was incapable of performing all the work itself. Martin has again met these standards, performing not 15% but 100% of the contract, as Hirth, the captain, and the engineer all knew.

In contrast to these cases, *Galehead* also gave two examples of cases in which the third party did *not* acquire a lien. In *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1559 (11th Cir. 1992), the owner was unaware of the third party's involvement. In *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 45 (1st Cir. 1986), the third party was a fuel broker who neither dealt with the owner nor physically supplied the fuel; the owner learned of the third party's involvement only when the transaction was billed.

After discussing these cases, the Eleventh Circuit concluded that the facts relating to Asamar were "much more like *Bonanni Ship Supply* and *Tramp Oil* than like *Marine Coatings* or *Stevens Technical*." *Galehead*, 183 F.3d at 1246. The court continued: "On this record, the evidence is insufficient to show that Asamar had the kind of relationship with Genesis that would establish that Genesis authorized Asamar's work on the vessel." *Id*. This phrasing makes clear that the court regarded this as a factual inquiry.

The same analysis—the same factual inquiry—produces a different result in the case at bar. Martin supplied 100% of the fuel, was known to and indeed closely coordinated the operation with Boldini, and obtained from Boldini a signed bunkering certificate that included both an assent to Martin's standard conditions and a recognition of Martin's maritime-lien claim. This case is much more like *Marine Coatings* and *Stevens Technical* than like *Bonanni Ship Supply* or *Tramp Oil*.

The parties cite cases from other jurisdictions on both sides of these issues. *Compare, e.g., Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988) (recognizing a maritime lien in favor of the physical supplier of fuel), *and Belcher Co. of Ala., Inc., v. M/V Martha Mariner*, 724 F.2d 1161 (5th Cir. 1984) (stating that a physical supplier of fuel who was retained by an intermediary, not by an owner or charterer, would have acquired a maritime lien had the transaction occurred in the United States), *with Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220 (5th Cir. 1999) (holding that a stevedore who was hired not by the charterer but by a company who contracted with the charterer did not acquire a maritime lien). None of the cases changes the law of the Eleventh Circuit as set out in *Galehead*.

Finally, ING relies heavily on an ever-growing line of district-court decisions arising from the O.W. collapse. Not surprisingly, Martin is not the only

supplier whose ox has been gored. Litigation has gone forward between ING and

other suppliers in the Southern District of New York and elsewhere. ING

apparently was, until now, undefeated. The most recent of the other decisions, at

least at this writing, is *Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland)*

*SA*, No. 14-CV-9287 (VEC), 2017 WL 78514 (S.D.N.Y. Jan. 9, 2017). *Clearlake*

cites earlier decisions reaching the same result. *See id.* at *6 (citing *Valero Mktg. &*

*Supply Co. v. M/V ALMI SUN*, 160 F. Supp. 3d 973 (E.D. La. 2016); *O'Rourke*

*Marine Servs. L.P., L.L.P. v. M/V COSCO HAIFA*, 179 F. Supp. 3d 333 (S.D.N.Y.

2016); *ING Bank N.V. v. Temara*, No. 16-cv-95 (KBF), 2016 WL 4471901

(S.D.N.Y. Aug. 24, 2016); *NuStar Energy Servs., Inc. v. M/V COSCO*

*AUCKLAND*, No. 14-CV-3648 (KPE), Dkt. 98 (S.D. Tex. Dec. 1, 2016)). All of

these cases have been decided on summary judgment.

     *Clearlake* seemingly recognized that its result smacked of inequity—the

court said it "sympathize[d] with" the physical suppliers, who believed they held

maritime liens, and that the outcome was "unfortunate." 2017 WL 78514, at *10.

But the court said the result was required, in part, by the Second Circuit's rule that

maritime liens are "*stricti juris.*" Black's Law Dictionary defines "*strictissimi*

*juris*," apparently the same thing, *see Atl. & Gulf Stevedores, Inc. v. M/V Grand*

*Loyalty*, 608 F.2d 197, 201 (5th Cir. 1979), to mean "to be interpreted in the

strictest manner." *Strictissimi Juris,* BLACK'S LAW DICTIONARY (9th ed. 2009). If,

when applied to the Maritime Lien Act, this means anything other than to construe

the statute to mean what it says, it is not the law of the Eleventh Circuit. *See*

*Galehead*, 183 F.3d at 1244 ("The test for determining who is entitled to a

maritime lien must come from a plain reading of the statute itself . . . ."); *see also*

*Atl. & Gulf Stevedores*, 608 F.2d at 201 (holding that analogous provisions of the

prior version of the statute are "not to be viewed through the constricting glass of

Stricti juris"). And if, in this context, "*stricti juris*" means anything other than to

render an honest construction of the statute, it is a lousy canon of construction. *Cf.*

A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS

318 (2012) (addressing the canon requiring strict construction of statutes in

derogation of the common law and concluding that a court should instead adopt a

"fair construction").

　　More importantly, *Clearlake* rejected *Galehead* and the other Eleventh

Circuit decisions on the ground that the Eleventh Circuit is "navigating outside the

mainstream" of American maritime law. 2017 WL 78514, at *9 (quoting *Integral*

*Control Sys. Corp. v. Consol. Edison Co. of N.Y., Inc.*, 990 F. Supp. 295, 301

(S.D.N.Y. 1998)). The Eleventh Circuit does not stand alone in recognizing

maritime liens for physical suppliers of necessaries, as *Ken Lucky* and *Belcher*—

decided by the Ninth and Fifth Circuits—demonstrate. Nor has anyone outside the

current line of O.W. cases reached a result quite so inequitable as ING proposes

here. Moreover, when faced with new circumstances, a court that rejects blind adherence to inapplicable precedents has ordinarily been heralded, not criticized for "navigating outside the mainstream." *See, e.g.*, *The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932) (L. Hand, J.). In any event, this case is being litigated in the Eleventh Circuit, whose decisions are binding.

Under the *Galehead* analysis, Martin acquired a maritime lien. Boldini discharged the lien by paying the disputed funds into the court's registry. Martin is entitled to recover from those funds.

### VI.  Quantum Meruit

If Martin is not entitled to recover for breach of contract (see section IV above), then with or without a maritime lien (see section V above), Martin is entitled to recover in quantum meruit.

In an admiralty case, general maritime law applies. General maritime law is federal law, but when neither statutory nor judicially created maritime law answers a specific legal question, a court may apply state law, if state law does not frustrate the national interest in uniformity in admiralty law. *See Sea Byte, Inc. v. Hudson Marine Mgmt. Servs., Inc.*, 565 F.3d 1293, 1298 (11th Cir. 2009). This means that on a quantum-meruit claim in an admiralty case arising in Florida, a court properly applies Florida quantum-meruit law. *Id*. at 1301 (applying Florida law on a quantum-meruit claim arising in admiralty in Florida). The quantum-meruit

principles that would apply under federal common law would not produce a

different result.

Under Florida law, to prevail on a quantum-meruit claim, a plaintiff must

show that (1) it conferred a benefit on the defendant; (2) the defendant had

knowledge of the benefit; (3) the defendant accepted or retained the benefit; and

(4) the circumstances are such that it would be inequitable for the defendant to

retain the benefit without paying its fair value. *Commerce P'ship 8098 Ltd. P'ship*

*v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997) (en

banc).

Martin has satisfied each of these elements in spades. Martin conferred a

benefit: 300 tons of fuel. Boldini knew of, accepted, and retained the benefit;

indeed, Boldini signed a certificate acknowledging the fuel's delivery. It would be

inequitable for Boldini to retain the benefit without paying for it. Boldini has not

sought to do so.

ING insists, though, that Martin cannot recover in quantum meruit because

there were relevant contracts—between Boldini and O.W. Middle East, at one end

of the transaction, and between O.W. USA and Martin, at the other end. ING

invokes a line of factually dissimilar Florida cases that provide superficial support

for ING's position. "Quantum meruit damages cannot be awarded when an

enforceable contract exists." *Cross v. Strader Const. Corp.*, 768 So. 2d 465, 466

(Fla. 2d DCA 2000) (citing *Corn v. Greco*, 694 So. 2d 833 (Fla. 2d DCA 1997));

*see also Sea Byte*, 565 F.3d at 1301. This principle would preclude Martin from

recovering on a quantum-meruit claim against O.W. USA; Martin's only claim

against O.W. USA would be for breach of contract.

This principle does not, however, bar Martin's quantum-meruit claim against

Boldini. Two Florida decisions illustrate the point.

First, in *Commerce*, the owner of an office building entered into a contract

with a general contractor for improvements to the building. The general contractor

in turn entered into a subcontract with a stucco provider for a relatively small

portion of the work. The general had a contract with, and a contractual duty to pay,

the subcontractor; the owner did not. Accordingly, the subcontractor expected to be

paid by the general, not by the owner. The subcontractor did not perfect a

mechanic's lien.

When the general did not pay the sub, the sub sued the general, but the

general declared bankruptcy. The sub then sued the owner in quantum meruit. The

Court of Appeal, sitting en banc, thoroughly analyzed Florida quantum-meruit law

and concluded that a subcontractor can recover from an owner, even though the

subcontractor has a contract with the general contractor, if two conditions are met:

first, the owner has received a benefit from the subcontractor's work, and second,

the owner has not paid for that work under the owner's own contract with the

general. If the owner has paid the general for the work, the owner cannot be required to pay the subcontractor.

Martin's quantum-meruit claim is on all fours with *Commerce*'s description of the circumstances in which a subcontractor has a quantum-meruit claim against an owner. Martin (the sub) provided a benefit to Boldini (the owner). Boldini has not paid O.W. Middle East (the general). So Martin has a valid quantum-meruit claim against Boldini. That there was a contract and subcontract does not change this—not in *Commerce*, and not here.

Similarly, in *GFR Leasing Corp. v. Transportation Equipment Specialists, Inc.*, 737 So. 2d 628 (Fla. 1st DCA 1999), GFR, an owner of shipping containers, leased them to a shipping company. The shipping company hired TES to make repairs. TES made the repairs, but the shipping company went out of business before paying TES. Citing *Commerce*, the court held that TES could recover from GFR in quantum meruit, because GFR knew about the repairs while they were in progress and eventually took back the containers, thus receiving the benefit of the repairs.

If, as *GFR* squarely held, TES could recover from GFR, even though GFR had a contract with the shipping company and the shipping company had a contract with TES, then Martin can recover from Boldini, even though Boldini had a

contract with O.W. Middle East and O.W. USA had a contract with Martin. There is no meaningful difference between the cases.

In sum, in *Sea Byte*, the Eleventh Circuit looked to Florida law to determine the validity of a quantum-meruit claim in an admiralty case arising in Florida. Under Florida law, if Martin does not have a valid contract claim against Boldini (as addressed above in section IV of this order), then Martin has a valid quantum-meruit claim, entitling Martin to an appropriate payment from the fund in the court's registry. The value of the fuel at the time and place of delivery was the price Martin quoted for the job, $286,200. That is the principal amount due on the quantum-meruit claim.

## VII. Interpleader

The analysis to this point fully establishes Martin's entitlement to prevail on its claim. Further support is provided by the equitable nature of an interpleader proceeding. "Interpleader generally is a suit in equity which invokes equitable principles." *Fulton v. Kaiser Steel Corp.*, 397 F.2d 580, 583 (5th Cir. 1968) (citing *Sanders v. Armour Fertilizer Works*, 292 U.S. 190, 200 (1934)). *Sanders* said that in an interpleader action, "The court is to weigh the right or title of each claimant under the law of the state in which it arose, and determine which according to equity is the better." *Sanders*, 292 U.S. at 200 (quoting *Armour Fertilizer Works v. Sanders*, 63 F.2d 902, 906 (5th Cir. 1933)). "In an interpleader . . . the remedy

draws on equitable principles and common sense." *Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 588 (D.C. Cir. 1993).

This order provides for the only equitable distribution of this fund—the only distribution that accords with common sense.

## VIII.  Conclusion

The law usually makes sense. In this case, as in most, the parties disagree on the applicable law. It turns out that here, as in most cases, the law makes sense. Despite the O.W. bankruptcies, this fund can be distributed precisely as the parties intended, making all parties whole.

For these reasons,

IT IS ORDERED:

1. It is declared that Martin had a valid contract claim, or alternatively a valid quantum-meruit claim, against Boldini that was satisfied by Boldini's tender into the court's registry of the full amount due on these claims.

2. It is declared that Martin had a valid maritime lien against the Bravante VIII that was discharged by Boldini's tender into the court's registry of the full amount it agreed to pay for the fuel at issue.

3. The clerk must disburse the funds in the court's registry as follows: $286,200 to Martin; $3,900 to ING; and a proportional share of the remainder

(interest paid into the court's registry by Boldini and interest earned on the funds after deposit in the registry) to Martin and ING.

4. The clerk must enter judgment providing for Martin and ING to recover from the fund as set out in paragraph 3 and dismissing all remaining claims with prejudice.

5. The clerk must make the disbursement required by paragraph 3 no earlier than the date specified in this paragraph 5. If a timely notice of appeal is *not* filed from the judgment entered under paragraph 4, the specified date is 14 days after the (expired) deadline to file a notice of appeal. If a timely notice of appeal *is* filed from the judgment entered under paragraph 4, the specified date is 14 days after the Court of Appeals issues its mandate dismissing the appeal or affirming the judgment.

SO ORDERED on January 26, 2017.

s/Robert L. Hinkle_____
United States District Judge